Anton E. Sundquist, Trading as Sundquist and Son, Appellee, v. Hardware Mutual Fire Insurance Company of Minnesota et al., Appellants.

Gen. No. 9,302.

Opinion filed August 16, 1938.
Opinion modified and rehearing denied October 4, 1938.

CLAUSEN, HIRSH & MILLER, of Chicago, and SHURT-LEFF & NIEHAUS, of Peoria, for appellants.

F. B. BRIAN, of Toulon, and ANDREWS & YOUNG, of Kewanee, for appellee.

MR. PRESIDING JUSTICE DOVE delivered the opinion of the court.

On December 18, 1935 the defendants issued to the plaintiff Anton E. Sundquist a policy of insurance by the provisions of which the defendants insured the plaintiff against loss or damage by fire to the amount of $8,000 from January 5, 1936 to January 5, 1937 on plaintiff's stock of merchandise consisting chiefly of furniture and contained in a one-story brick, metal roof, building, located at No. 315 and No. 317 Market street in Galva, Illinois. On August 27, 1936, the defendants also issued to the plaintiff another policy of insurance also insuring plaintiff against loss or damage by fire to the amount of $1,000 from August 24, 1936 to August 24, 1937 on the same merchandise

contained in the same building. Under the provisions of the policies, each defendant became severally liable to pay one-third of any loss sustained under the policies. While the policies were both in effect and on the evening of December 24, 1936 the property covered by said policies of insurance was destroyed by fire. Proofs of loss were furnished the companies but payment having been refused, the plaintiff on May 8, 1937 instituted this suit. The complaint alleged the issuance of the policies and the destruction by fire of the property insured, alleged that the value of the property insured, at the time of the fire, was $20,000, that the plaintiff was the owner thereof and had in all respects complied with the provisions of the policy on his part to be performed and praying for judgment against the defendants for $9,000 with 5 per cent interest from February 25, 1937. The answer of the several defendants admitted the issuance and deliverance of the policies declared upon and admitted a destruction of the property by fire on December 24, 1936 but denied that the plaintiff was damaged to the extent of $20,000 and denied that his goods, merchandise, furniture and fixtures were worth at the time of the fire said sum of $20,000. The answer further alleged that each of the policies of insurance contained the following provisions: "This policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof or if the interest of the insured in the property be not truly stated herein, or in case of any fraud or false swearing by the insured, touching any matter relating to this insurance or the subject thereof, whether before or after a loss." The answer then alleged that the plaintiff violated this provision of the policies in the following particulars, viz: First, by representing to the defendants, after the fire, that the cause of the fire was unknown while in truth

and in fact plaintiff well knew that it was incendiary; Second, by rendering to the defendants on February 6, 1937 certain documents purporting to be sworn statements in his proof of loss, which were signed and sworn to by the plaintiff in which he swore that the cause and origin of the fire was unknown to him when in truth and in fact the plaintiff well knew that the fire was of incendiary origin; Third, that in said proof of loss plaintiff swore that the cash value of the property insured under the policies was $20,117.42, whereas in truth and in fact the value of the merchandise insured was less than $5,000; Fourth, that plaintiff also swore in his proof of loss that the whole loss and damage to his merchandise was $20,117.42, whereas in truth and in fact the whole loss and damage to said merchandise was less than $5,000 as the plaintiff then and there well knew; Fifth, that in his proof of loss the plaintiff also represented that certain property claimed to have been insured by the defendants had been damaged and destroyed, which in truth and in fact had not been damaged or destroyed by fire and was not in the building at the time of the fire as the plaintiff then and there well knew. The answer further alleged that all of said false and fraudulent statements related to material facts and circumstances concerning the insurance in question, that they were wilfully made by the plaintiff with the intention to cheat and defraud the defendants and that the plaintiff wilfully and maliciously set fire to or caused fire to be set to the building and property described in the policy of insurance and that by reason thereof and by reason of said false and fraudulent statements made in the proof of loss defendants are not liable under either of the said policies of insurance. In his reply plaintiff denied the several charges made against him by the defendants in their answer and the issues were submitted to a court and jury, resulting in a general verdict finding the issues

for the plaintiff and assessing his damages at $9,259.95 and apportioning one-third of said amount against each defendant. There were also submitted to the jury six special interrogatories. By the first the jury especially found that the actual cash value of the plaintiff's stock of merchandise covered by the policies of insurance sued on immediately prior to the fire was $18,165.21. By the second special interrogatory the jury found the actual cash value of plaintiff's furniture and fixtures covered by the policies sued on immediately prior to the fire was $1,952.21. Special interrogatory No. 3 is as follows: "In his proofs of loss signed and sworn to by him, did the plaintiff falsely and fraudulently, with the wilful purpose of cheating and defrauding the defendants, swear that the cash value of the property covered by the policies of insurance sued on at the time of the fire was greater than the actual cash value thereof?" Special interrogatory No. 4 was: "In his proofs of loss signed and sworn to by him did the plaintiff falsely and fraudulently, with the wilful purpose of cheating and defrauding the defendants, swear that the amount of the whole loss and damage sustained under the policies of insurance sued on in the fire in question was greater than he actually sustained?" Special interrogatory No. 5 was: "In his proofs of loss signed and sworn to by him, did the plaintiff falsely and fraudulently, with the wilful purpose of cheating and defrauding the defendant, swear that the origin of the fire in question was unknown to the plaintiff when in truth and in fact the plaintiff then knew that the said fire was of incendiary origin?" Special interrogatory No. 6 was: "In his proofs of loss signed and sworn to by him, did the plaintiff falsely and fraudulently, with the wilful purpose of cheating and defrauding the defendants, swear that more property had been damaged and destroyed by the fire in question than was actually damaged and

destroyed by said fire?" The jury answered each of these special interrogatories in the negative and after overruling a motion for a new trial, the court rendered appropriate judgments upon the verdict and the defendants have prosecuted this appeal.

From the pleadings and the evidence it appears that prior to 1922 William E. Emery conducted a retail furniture business at said No. 315 and No. 317 Market street in Galva, that he was adjudicated a bankrupt and his stock of merchandise consisting of furniture, rugs, house furnishings, phonographs, records, pianos, piano players and music was duly appraised at $9,621.20 and on January 24, 1922 sold at public sale by his trustee under the direction of the United States District Court for the Northern Division of the Southern District of Illinois, to appellee for $6,500. From that time until the building and contents were destroyed by fire on the evening of December 24, 1936, appellee conducted a retail furniture store at this address. At the time of the trial appellee testified that he was 59 years of age, lived in Toulon and had lived there all his life, where he also conducted a furniture store. At the time of the fire, insurance aggregating $18,500 was being carried by appellee upon the property destroyed. Elwin E. Bartlett was an insurance salesman and represented appellants and testified that he had known appellee for four years and that appellee had been paying appellants between 80 and 100 dollars a year for insurance for some time. That on August 24, 1936 Bartlett called upon appellee at his store in Galva and discussed insurance with him in his office, which was located in the back part of the store, that appellee advised him that he was then carrying $17,500 upon his stock of merchandise which he, appellee, valued at $22,000 but stated he might increase it. That Bartlett then told him about the 80 per cent coinsurance clause and advised him that as his stock

was valued at $23,000, 80 per cent thereof would be $18,400 and in order to obtain the 15 per cent discount upon his premium, which he would receive if he carried 80 per cent of the value of his stock in insurance, he should increase his insurance $1,000, which was done and the $1,000 policy involved in this proceeding was afterward executed and delivered to appellee. Bartlett further testified that upon this visit appellee advised him that he had $5,000 windstorm insurance upon his stock of goods and that he, Bartlett, then wrote appellee an additional $13,500, making the fire and windstorm insurance which he carried each aggregate $18,500.

Between 9:30 and 10:30 o'clock on the evening of December 24, 1936, appellee closed his store and went to the Galva Cafe located four or five doors west of his store and there ate a bowl of soup. While there, O. M. Peterson, an employee of appellee, who did janitor work for him and who had fixed the fire in the furnace and left appellee's store about 9:30 o'clock that evening, came into the cafe and informed appellee that some ceiling lights controlled by a switch just inside the front door had been left burning in the store and appellee, after he finished his soup, returned to the store, unlocked the door, turned the switch, thereby turning off the lights, locked the door and entered his car which was parked near by and drove to Toulon. About 11 o'clock that evening Charles K. Hilton, the night patrolman, discovered smoke coming from the lower windows just beneath the plate glass windows at the front of the store and about the same time Howard F. Reed, the chief of police, who was about 100 feet west of the rear of the building, also noticed dark smoke coming out of the east cellar door. The fire apparently originated in the basement and practically the entire stock of goods and fixtures of appellee were destroyed. During the course of the fire an ex-

plosion occurred which blew the front plate glass windows and portions of the front of the building "halfway across the eighty foot pavement" as one witness described it. In digging into the debris after the fire some burlap and a portion of a porch swing were found about 30 feet from the rear end of the building and near the east basement wall, which according to the testimony smelled like kerosene or coal oil and some of this burlap and some of the pieces of wood from the swing were offered in evidence at the trial and have been transmitted to this court and have been examined by us.

Upon blanks, appellee on February 6, 1937 submitted to appellants his sworn statement in connection with his proof of loss, in which he stated that the total amount of insurance which he carried upon the property covered by appellants' policies at the time of the fire amounted to $18,500, that the cash value of the property insured at the time of the fire was $20,117.42, that the loss and damage which he sustained amounted to the same sum, that he claimed the full amount of the policies aggregating $9,000 and that the loss did not originate by any act, design or procurement of appellee. The evidence is that in May, 1936 appellee took an inventory of his stock of merchandise and the proof of loss which he furnished appellants on February 6, 1937 was made from this inventory, that his inventory disclosed that to the actual cost price of each article appellee added the freight and in computing the value of his stock of merchandise at the time of the fire he added to the aggregate amount so shown by the inventory the sum of $995.37, being the cost of merchandise purchased by him from May 1st to the date of the fire, and deducted therefrom a depreciation of 15 per cent on his stock and 25 per cent on his fixtures and then deducted $1,381.32 therefrom, being the amount of his

cash and credit sales from May 1, 1936 to the date of the fire, less an average profit thereon of 33⅓ per cent.

One of the issues of fact raised by the pleadings was whether appellee set fire to the insured property. The jury found he did not and counsel for appellants concede that under the evidence the finding of the jury was justified. Counsel insist, however, that there were some suspicious circumstances shown by the evidence with reference to the origin of the fire, which the jury should have taken into consideration in passing upon the issue raised by the pleadings as to the value of appellee's stock of merchandise and the amount of loss he sustained and that these circumstances together with the evidence which tended to prove that appellee made certain false statements under oath for the purpose of establishing an excessive valuation upon his stock of merchandise and fixtures should be held to have avoided the policy and appellee thereby precluded from asserting any claim thereunder. The suspicious circumstances referred to by counsel is the finding of the burlap and portion of the porch swing which contained the odor or kerosene, the statement of appellee, testified to by the fire marshall, that he, appellee, purchased a gallon of kerosene two weeks before the fire to be used in a sweeping compound, which conflicts with his testimony at the trial which was to the effect that he used the kerosene to pour down a sink drain to destroy the odor of gas. Also the testimony of the fire marshall to the effect that appellee stated to him that other than the kerosene there were no other inflammables in the store while on the trial of the cause appellee testified there was a 10-gallon can containing roofing paint and a 5-gallon can half full of cylinder oil in the basement at the time of the fire. Appellee testified this roofing paint was acquired by him at the time he bought the store in 1922 while Emery, the former owner, denied that he had any paint in the

store while he operated it and Peterson, an employee of appellee, testified he had not seen the can of roofing paint referred to. Counsel also call our attention to the testimony of appellee and statements made by him wherein he stated at one time that he left the store about 9:40 o'clock the evening of the fire, at another time he said he thought it might have been close to 10 o'clock and again said it was perhaps 10 minutes after 10 o'clock, and to the evidence which discloses that appellee at the time of the fire was indebted to the owner of the building for rent and other testimony which tended to show that he was in some financial difficulty. The false statements to which counsel refer are these. First: appellee testified at the trial upon cross-examination that as he remembered the transaction in 1922, he purchased this stock of merchandise and paid therefor between $14,000 and $16,000. In rebuttal appellee testified that what he meant when he testified that he purchased the stock of merchandise and paid therefor a sum between $14,000 and $16,000 was that the inventoried value of the entire stock when he opened up for business in Galva was that sum. Second: That on February 23, 1937, appellee executed an affidavit to appellants' adjuster in which he stated that he had purchased the entire stock of Will Emery of Galva, Illinois in 1922 and that the stock consisted chiefly of furniture, stoves, sewing machines and victrolas and did not contain any pianos and that he paid therefor between fifteen and sixteen thousand dollars to the First National Bank of Galva, Illinois, who were receivers of this stock. Third: In an examination before the trial, appellee was asked: "You remember what you paid for that bankruptcy stock?" and he replied: "I know I borrowed $10,000.00 of Mr. Dewey, and I paid somewhere between twelve and fourteen thousand dollars: I guess it was nearly sixteen thousand dollars." Appellee then testified that he bought

the stock at a trustee's sale and that he gave a check therefor on the day of the sale for the amount thereof. Fourth: That upon the trial appellee was asked: ''Now, in these sixteen sheets (referring to the schedule of merchandise which appellee claimed was in the store at the time of the fire) is there anything you had in that store more than three years?'' to which appellee replied: ''Not as I remember.'' Fifth: That his testimony as to when he purchased his fixtures and also certain pianos and the price he paid therefor was untrue as was also his testimony on the question of turnover. The facts are that the stock was not bought from Will Emery but from A. E. Bergland, his trustees in bankruptcy, that appellee did not pay therefor between $14,000 and $16,000 to the First National Bank of Galva but did pay therefor $6,500 to said trustee Bergland to whom he paid $650 on the day of the sale and the balance upon the approval thereof. The evidence also tends to show that the stock as originally purchased contained some pianos, that some of them were in the building when destroyed by fire and from the volume of sales to which appellee testified, it is apparent that he did not turn over his stock of merchandise as frequently as his testimony would indicate.

Counsel for appellants concede that ordinarily the question of fraud and false swearing as to valuation are questions of fact to be determined by the jury but argue that under the express provisions of these policies there was such fraud and false swearing as to preclude a recovery and cite *Ledford v. Hartford Fire Ins. Co.,* 161 Ill. App. 233; *Kavooras v. Insurance Co. of Ill.,* 167 Ill. App. 220; *Butler v. Security Ins. Co.,* 244 Ill. App. 379 and several other cases from other jurisdictions. In the *Ledford* case, *supra,* the court held that a provision in the policy similar to the provisions which the policies here contained was a reasonable one and that where it appeared false statements

under oath were knowingly and purposely made by the assured for the purpose of procuring falsely excessive valuation of the property lost, that then the assured could not recover. In the *Kavooras* case, *supra,* it appeared that the assured by false representations as to the amount and value of his stock of goods obtained a $3,000 policy of insurance upon a stock valued at not to exceed $1,500 and the court held that these false representations, together with the fact that assured was guilty of wilful false swearing upon the trial, rendered the policy void and precluded a recovery thereon. In *Butler v. Security Ins. Co., supra,* it appeared that in his proofs of loss the assured placed a value of $1,496 upon an item that had been used for 35 years and never had a value to exceed $400 and that he listed and swore to other articles on a similar basis and the court held that from all the evidence the finding of the jury that the plaintiff had sustained a loss in the sum of $5,000 was manifestly against the weight of the testimony.

The facts in these cases relied upon by appellants are clearly distinguishable from the facts as found in this record. Appellee presented to appellant a detailed and itemized proof of loss and the inventory of May 1, 1936 gave the quantity, description and value of each item of merchandise and covers fourteen pages of the abstract, together with the inventory of appellee's furniture and fixtures, which covers an additional page of the abstract. This proof of loss and inventory were offered and admitted in evidence. Elwood R. Kroos, an insurance adjuster employed by appellee two or three weeks after the fire, and who had examined appellee's inventory, journal, ledger, record of cash sales, statements of account and invoices from wholesalers and manufacturers with whom appellee dealt, and who had seen appellee's stock before the fire, together with several other witnesses who had

been in appellee's store and were familiar with his stock of merchandise testified at length on behalf of appellee. There was also some evidence on behalf of appellant to the effect that the pianos, radios, talking machine and music were not as valuable as the testimony of appellee and his witnesses would indicate. The record contains more than 750 pages and we have read the abstract of the testimony and while, as said in *Weininger v. Metropolitan Fire Ins. Co.*, 359 Ill. 584, appellee was naturally interested in the amount of his recovery and by reason of his interest and bias may have testified to greater values than other witnesses, still it does not necessarily follow that his testimony was false within the meaning of the terms of the policy. False swearing in a proof of loss in order to avoid the insurance policy must be wilful and with intent to deceive and defraud the insurer. *Weininger v. Metropolitan Fire Ins. Co., supra.* In some jurisdictions it has been held that false swearing in proofs of loss cannot be made available as a defense unless shown to have been made with intent to deceive and also that prejudice or injury resulted. *Dalton v. Milwaukee Mechanics' Ins. Co.*, 126 Iowa 377, 102 N. E. 120 and other cases cited with approval in *Young v. California Ins. Co.*, 55 Idaho 682 at pages 690, 691. In the instant case it is conceded that appellee sustained a loss and that he furnished proofs of loss as required and while the defense is predicated upon what transpired thereafter, it is well to bear in mind that appellants' representative was in appellee's store less than four months before the fire. Appellee did not send for him but he came in the course of his regular work. He observed appellee's stock of goods. He advised appellee how he should carry his insurance in the most economical manner. Appellee then advised him of the value he placed on his stock and it was at the suggestion of the agent, not appellee, that the additional $1,000 insur-

ance was written. Appellee's inventory of May 1, 1936 disclosed the value of his stock and fixtures to be $22,813.31. His proof of loss stated the value to be $20,117.42. The jury heard all the evidence and specifically found the actual cash value of the stock and fixtures to be $20,117.42 and specifically found that appellee did not know that the fire was of incendiary origin and did not misrepresent to appellants the value of his property or the amount of his loss or that more property was damaged or destroyed than was actually damaged and destroyed. The evidence found in this record sustains these several findings and the trial court having approved them, we would not be justified in disturbing the judgment rendered thereon.

It is insisted that the trial court erred in permitting the witness Kroos to give to the jury his estimate of the gross value of appellee's furniture immediately prior to the fire, basing his estimate upon the invoices, examination of the invoices and his examination of the inventory and other books of appellee. Kroos placed a value of $22,822.56 thereon. He was then asked what deductions he made from that amount before presenting any statements to the adjusters for appellants and replied that he deducted the sales for cash and credit from the time the inventory was made to the date of the fire, deducted not only the average profit thereon but also a further deduction of 25 per cent on the furniture and fixtures and 15 per cent on the stock for depreciation. The ruling of the court was harmless conceding it was erroneous because the record shows that plaintiff's Exhibit E was admitted in evidence without objection and this exhibit contains a summary of appellee's loss and damage to his stock which is given at $18,165.21 and to his furniture and fixtures at $1,952.21 or a total of $20,117.42. It is also insisted that the court erred in permitting Cyrus Kelly, a resident of

Galva and who was familiar with appellee's stock of merchandise, to testify in answer to a question as to the character of the merchandise as it appeared to him, whether it was new, marketable or otherwise, that it was new and was marketable. The record discloses that no objection was made by counsel for appellant to this question. Another witness, Guy Baltimore, an agent for one of the other insurance companies which carried insurance upon this stock and who had frequently been in appellee's store and testified that he made a casual examination of the stock in September, 1936 was permitted to state that the store appeared to him at that time to be ''about as full as he (appellee) could get it of up to date furniture.'' In view of the other evidence found in the record, we do not believe appellant was prejudiced by the trial court's refusal to strike this answer.

It is finally insisted that the court erred in refusing to charge the jury that if they believed from a preponderance or greater weight of the evidence that the plaintiff, with intent to cheat and defraud the defendants, wilfully and maliciously set fire to or caused to be set fire to, or burned or caused to be burned, the property described in the policies of insurance sued on, then your verdict should be for the defendants. There was no error in refusing this instruction. Where a felony is charged in the pleadings in a civil case, the offense must be proved beyond a reasonable doubt. *McConnel v. Delaware Mut. Safety Ins. Co.,* 18 Ill. 228; *Rost v. Noble & Co.,* 316 Ill. 357; *Kuhl v. Clark,* 261 Ill. App. 491; *Wargo v. Buske,* 273 Ill. App. 28; *Gannon v. Kiel,* 252 Ill. App. 550.

The evidence conclusively shows the loss of the property insured and while appellee was not required to prove the cause of the fire, the record contains evidence from which the jury might have inferred that it was caused by gas escaping into appellee's basement. This

record is not free from all error but from the competent evidence therein, we are of the opinion the jury were justified in returning the general verdict it did and the several special findings. The judgment will therefore be affirmed.

*Judgment affirmed.*